| | AUSA: | Timothy J. Wyse | Telephone: (313) 226-9144 |
|---|---|---|---|
| | Special Agent: | Jacqueline Marquardt (FBI) | Telephone: (313) 965-6267 |

AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT
for the

## Eastern District of Michigan

United States of America

v.

Danielle Moore

Case No.

Case: 2:24−mj−30081
Assigned To : Unassigned
Assign. Date : 3/4/2024
Description: RE: SEALED MATTER
(EOB)

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____03/2020 to 02/2021_____ in the county of _____Wayne_____ in the
_____Eastern_____ District of _____Michigan_____, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 666(a)(1)(B) | Theft or bribery concerning programs receiving federal funds. |
| 18 U.S.C. § 1343 | Wire fraud. |
| 18 U.S.C. § 1028A | Aggravated identity theft. |
| 18 U.S.C. §1349 | Conspiracy to commit wire fraud. |

This criminal complaint is based on these facts:

☑ Continued on the attached sheet.

_Complainant's signature_

Jacqueline Marquardt, Special Agent, FBI
_Printed name and title_

Sworn to before me and signed in my presence
and/or by reliable electronic means.

Date: __March 04, 2024__

City and state: __Ann Arbor, MI__

_Judge's signature_

Hon. David R. Grand, United States Magistrate Judge
_Printed name and title_

## Affidavit in Support of an Application for Criminal Complaint

I, Jacqueline E. Marquardt, Special Agent of the Federal Bureau of Investigation, being duly sworn, state that:

## Introduction and Agent Background

1.     I make this affidavit in support of a criminal complaint charging DANIELLE MOORE with theft or bribery concerning programs receiving federal funds (18 U.S.C. § 666(a)(1)(B)), wire fraud (18 U.S.C. § 1343) aggravated identity theft (18 U.S.C. § 1028A), and conspiracy to commit wire fraud (18 U.S.C. §1349).

2.     I have been employed by the Federal Bureau of Investigation ("FBI") since August 2021 and have been assigned as a Special Agent in the Public Corruption Squad of the Detroit Field Office since January 2022. Accordingly, I am a federal law enforcement officer qualified to be an affiant under 18 U.S.C. § 2510(7) for criminal complaint. As a Special Agent, I have investigated crimes including corruption of state and local officials, fraud against the government, and antitrust violations. During this time, I have been either the lead FBI agent or supporting agent on investigations involving criminal schemes targeting the State of Michigan (SOM) Unemployment Insurance Agency (UIA) or Pandemic Unemployment Assistance (PUA) claims through the filing of false or fictitious unemployment insurance (UI) claims or through unauthorized assistance by SOM employees. Based on my experience with these cases, I have become familiar with the tools and methods that criminals use to attack and exploit the UI systems as well as the criminal's reliance on the use of email and other internet or online tools and systems to facilitate the fraud.

3.     Prior to joining the FBI, I was employed as a criminal prosecutor in Chicago, Illinois for almost eleven years. As a criminal prosecutor, I prosecuted numerous criminal offenders for fraud, identity theft, murder, sexual assault, and other state criminal offenses.

4.     From both my time as an FBI agent and with the prior prosecution of cases, I am familiar with the gathering of evidence from digital accounts and devices used by criminals to communicate about and document fraudulent/corrupt activities.

1

5.     I make this affidavit based upon personal involvement in the subject criminal investigation, including the review of financial and bank records, utility records, internet service provider records, property records, law enforcement intelligence data bases, criminal histories, records from SOM regarding UI claims, search warrants and subsequent review of seized evidence, and law enforcement surveillances detailing a large scale UI fraud scheme perpetrated by DANIELLE MOORE, Terrell Mason (Mason), and others both known and unknown. I have also been provided with information from other law enforcement agents and officials from the Federal Bureau of Investigation (FBI), U.S. Probation Officers (US POs), and the State of Michigan's Fraud Investigation Unit (SOM-FIU). Because this affidavit is submitted for the limited purpose of supporting a criminal complaint and arrest warrant, it does not necessarily contain all information and facts discovered and developed in the course of this investigation.

6.     As a result of my participation in this investigation, I submit that there is probable cause to believe that DANIELLE MOORE has committed federal crimes, including theft or bribery concerning programs receiving federal funds (18 U.S.C. § 666(a)(1)(B), wire fraud (18 U.S.C. § 1343), aggravated identity theft (18 U.S.C. § 1028A), and conspiracy to commit wire fraud (18 U.S.C. §1349).

### Summary

7.     This investigation is focused on an Unemployment Insurance Agency (UIA) and Pandemic Unemployment Assistance (PUA) fraud conspiracy centered on SOM contracted employee DANIELLE MOORE (MOORE). MOORE was involved in a UIA and PUA fraud scheme operating within the Eastern District of Michigan (EDMI) between the spring of 2020 through February of 2021. MOORE was employed by the State of Michigan (SOM), Michigan Works Agency (MWA) and was assigned to work as a claims examiner for the Michigan Unemployment Insurance Agency (MUIA) during the onset of the COVID-19 pandemic in the spring of 2020. MOORE received training on the MUIA system called MiDAS and MUIA gave her access to the system through her MWA assigned Dell Laptop.

8.      MOORE used her inside access and knowledge to cause the State of Michigan to fund fraudulent unemployment claims filed by Terrell Mason.[1] These included claims in the name of at least forty known incarcerated prisoners and at least one non-prisoner. After filing these claims, Mason called MOORE to "push" the claims through the state's UI system. Fraudulent claims filed by Mason in the name of incarcerated prisoners resulted in the outlay of approximately $430,972.44 in fraudulent UIA/PUA proceeds, with MOORE's direct access and alteration resulting in the outlay of approximately $282,452.24 of that amount. The one additional known claim filed by Mason's scheme resulted in the outlay of approximately $12,480 in fraudulent UIA/PUA proceeds, with MOORE's direct access and alteration resulting in the outlay of approximately $7,600. After Mason received payment on the claims, he kicked back money to MOORE. During this time, MOORE's then roommate witnessed MOORE's activity.

9.      During the execution of a search warrant at MOORE's residence, agents recovered numerous items of evidence showing MOORE's involvement in the scheme, including MOORE's cell phone. Numerous pieces of paper and notebooks were collected that documented over 300 UIA/PUA claim numbers and/or personal identifying information (PII).

10.      In addition to the scheme linked to Mason, review of MOORE's cell phone showed that MOORE was provided with the PII and/or UIA/PUA claim numbers for at least 188 individuals via text message. SOM-FIU confirmed MOORE accessed 162 of those claims and altered 86 of those claims, which resulted in the outlay of approximately $1,217,004.84 in fraudulent UIA/PUA proceeds. Some of the PII found in the text messages matched some of the handwritten PII found during the search of MOORE's residence.

11.      In total, the State of Michigan funded approximately $1,507,057.08 of fraudulent claims that were altered by MOORE. Those claims were paid through the U.S. Mail and/or through wire transfers utilizing the nation's electronic financial infrastructure.

---

[1] Mason pleaded guilty and has been convicted for his role in this scheme, as described in more detail below.

3

## **Unemployment Insurance – Background & COVID-19**

12.    The Social Security Act of 1935 initiated the federal and state unemployment insurance system. The system provides benefits to individuals who are unemployed for reasons beyond their control. The purpose of the UI system is twofold: first, to lessen the effects of unemployment through cash payments made directly to laid-off workers, and second, to ensure that life necessities are met on a weekly basis while the worker seeks employment. The various state unemployment insurance agencies responsible for administering the UI programs are commonly referred to as State Workforce Agencies (SWA). In the State of Michigan, the State of Michigan Unemployment Insurance Agency (SOM-UIA) administers the UI system.

13.    As a result of the COVID-19 pandemic. Beginning in or about March 2020 and continuing through September 4, 2021, the U.S. Government provided federal funds to the states, including the State of Michigan to supplement unemployment benefits through multiple government programs.  Those government programs include but are not limited to, Families First Coronavirus Response Act (FFCRA); Coronavirus Aid, Relief, and Economic Security (CARES) Act; and American Rescue Plan Act of 2021 (ARPA) and Lost Wages Assistance Program (LWAP).   These federal programs allowed for the significant outlay of federal funds flowing to and through the states to offset the historic need for unemployment benefits by the American workforce, including in the SOM and in the EDMI. Collectively, these benefits are often referred to as Pandemic Unemployment Assistance (PUA). The federal funds provided to the State of Michigan during this period under each of these programs exceeded $10,000 per year.

14.    Normally, in the absence of fraud, an individual initiates an unemployment claim (UI claim) by submitting a claim in person, over the telephone, or on the internet through the State Workforce Agency (SWA) website.  To qualify for UI benefits, the claimant must demonstrate a certain level of earnings in several quarters immediately preceding the application.  The amount of unemployment benefits the UI claimant qualifies for depends on a

variety of factors, including but not limited to, the length of his or her previous employment and the amount of wages he or she earned.

15. The SWA will approve or reject the UI claim based on the application and information provided by the claimant. If the SWA approves a UI claim, the claimant is required to re-certify the claim via telephone or internet at various times throughout the claim process. The claimant must also certify that he or she is still unemployed and actively seeking work.

16. Some claims have multiple weeks of payments pending certification and amount to larger sums. Those claims are labeled under "Benefit Payment Review' and require a manager's review and approval for the payments to be released.

17. Once an application is approved, the SOM provides unemployment benefits through two financial means: 1) a Bank of America (BOA) issued debit card is mailed to the claimant through the U.S. Postal Service, or 2) the claimant provides a bank account number where the benefits are directly deposited through electronic funds transfers (EFTs). The EFTs originate from one or more accounts maintained by the Michigan Unemployment Insurance Agency (MUIA) at BOA. BOA is a financial institution as defined by 18 U.S.C. § 20.

18. All EFTs of unemployment insurance benefits to Michigan unemployment insurance claimants, whether through a debit card or bank account, involve interstate wire communications through the transmission of electronic signals from BOA's two data centers located in Virginia and Colorado.

## Unemployment Insurance – Fraud Prevention

19. To combat fraud, SOM UIA captures certain external data surrounding the interaction between an individual and the UIA system named the Michigan Integrated Data Automated System (MiDAS). Each time a claim is accessed in MiDAS, it creates a digital footprint by collecting data including dates, times and Internet Protocol (IP) addresses, and Media Access Control (MAC) addresses associated with a device accessing the claim. The SWA and SOM systems tie this information to the user-entered information captured to

facilitate the claim (i.e., name, address, social security number, BOA or other bank account numbers, routing numbers, etc.) It is through the analysis of this data that the SWAs and investigating agents can identify fraudulent trends and tendencies associated with certain claims.

20.   SOM's MiDAS system also utilizes certain proprietary algorithms that automatically identify and stop possible fraud based on whether a claim exhibits fraudulent indicators that exceed a designated threshold. Furthermore, humans who review claims can also take actions to stop payments of claims should they conclude that the payments may be involved in fraud. For the remainder of this affidavit, the investigating agent will refer to the process detailed above as a "fraud-stop."

21.   To combat internal misconduct, SOM UIA also captures internal data surrounding the interaction between SOM employees, contractors, and consultants through MiDAS.  MiDAS maintains an "audit trail," which identifies any employee who touches, alters, or otherwise modifies a claim. An employee is identified in MiDAS through their required unique credentials or username. The SOM maintains workflow logs of each employee that note which claims are assigned to a particular employee.

22.   Additionally, SOM maintains call logs to document telephonic contact between insiders and claimants. The workflow logs and call logs detail whether insiders had a legitimate reason to access or modify a claim.

23.   Investigators from SOM-FIU can access and review the data maintained for both external and internal actors in MiDAS. It is through the analysis of this data that investigating agents can identify fraudulent trends and tendencies associated with certain claims.

## Probable Cause

24.   In January 2021, the FBI, Department of Labor, Office of Inspector General (DOL-OIG), and SOM-FIU began investigating a suspected PUA fraud scheme involving prisoners housed in Milan Federal Correctional Institution (Milan FCI). At that time, the investigation was focused on the individual prisoners, as they are not entitled to

UIA/PUA benefits. As noted above, individuals legitimately entitled to UIA/PUA benefits must demonstrate a lack of employment through no fault of their own. However, incarceration does not meet the "no fault" standard and is therefore not a permissible/legitimate qualification to draw UIA/PUA benefits.

25.   The investigation revealed that MOORE obtained numerous individuals' PII and/or claim information and then accessed and altered those claims, in exchange for cash and other items of value, allowing the UIA/PUA payments to be paid on those fraudulent claims.

*Prisoner UIA/PUA Claims*

26.   SOM-FIU reviewed multiple prisoners' claims in their UI system named MiDAS and linked them to Charter-Spectrum internet protocol (IP) address, IP address XX.XX.XXX.127 (IP.127). When SOM-FIU's scrutinized all of IP.127 activity in MiDAS, it showed that IP.127 had filed, accessed, and modified a set of at least 48 UIA/PUA claims in 2020. This raised red flags to SOM-FIU as 48 claims accessed by a single IP address was indicia of fraud.

27.   Comparing the claimant names and PII used in the subject claims against the Bureau of Prisons (BOP) & Michigan Department of Correction (MDOC) information showed that about 47 of the purported claimants were on parole, probation, or incarcerated in locations like Milan FCI, Morgantown FCI, and MDOC's Jackson-Cooper Street Facility, Macomb County Correctional Facility, Saginaw Correctional Facility, Baraga's Maximum Correctional Facility, and others at the times the claims were filed (hereafter referred to as the "subject prisoner claims"). The table below details pertinent information regarding the subject prisoner claims all of which were filed between April 24, 2020 and June 5, 2020:

| Claim No. | MiDAS Claim No. | Claimant Name | Actual Loss | Potential Loss | Moore Accessed | Moore Altered | Payment After Moore Altered |
|---|---|---|---|---|---|---|---|
| 1 | C6557064-0 | A.C. | $0 | $18,240 | Yes | Yes | $0 |
| 2 | C8092614-0 | A.E. | $4,880.00 | $18,240 | Yes | No | $0 |
| 3 | C8109552-0 | A.E. | $4,880.00 | $18,240 | Yes | No | $0 |
| 4 | C7817661-0 | A.H. | $0 | $18,240 | Yes | Yes | $0 |
| 5 | C8794419-0 | A.J. | $17,287.36 | $18,240 | Yes | Yes | $17,287.36 |
| 6 | C8080481-0 | A.J. | $17,760.00 | $18,240 | Yes | Yes | $17,760.00 |
| 7 | C7793256-0 | A.M. | $9,440.00 | $18,240 | No | No | $0 |
| 8 | C8241402-0 | B.P. | $0 | $18,240 | Yes | Yes | $0 |
| 9 | C7843340-0 | B.S. | $16,160.00 | $18,240 | Yes | Yes | $11,280.00 |
| 10 | C8006781-0 | C.E. | $2,760.00 | $18,240 | Yes | Yes | $2,760.00 |
| 11 | C7735711-0 | C.S. | $16,680.00 | $18,240 | Yes | Yes | $16,680.00 |
| 12 | C8269553-0 | C.W. | $17,120.00 | $18,240 | Yes | Yes | $17,120.00 |
| 13 | C8006806-0 | D.E. | $4,880.00 | $18,240 | Yes | No | $0 |
| 14 | C7970228-0 | D.G. | $13,720.00 | $18,240 | Yes | Yes | $13,720.00 |
| 15 | C7415985-0 | D.H. | $16,160.00 | $18,240 | Yes | Yes | $16,160.00 |
| 16 | C7950188-0 | D.K. | $4,120.00 | $18,240 | No | No | $0 |
| 17 | C7601901-0 | D.M. | $4,880.00 | $18,240 | Yes | No | $0 |
| 18 | C8242573-0 | D.P. | $19,880.00 | $35,120 | Yes | Yes | $19,880.00 |
| 19 | C8106947-0 | D.P. | $3,080.00 | $18,240 | Yes | Yes | $3,080.00 |
| 20 | C7569804-0 | D.S. | $0 | $18,240 | Yes | Yes | $0 |
| 21 | C8270357-0 | D.S. | $4,880.00 | $18,240 | Yes | No | $0 |
| 22 | C7211524-0 | J.A. | $738.00 | $18,240 | Yes | No | $0 |
| 23 | C8142664-0 | J.E. | $16,864.88 | $18,240 | Yes | Yes | $11,984.88 |
| 24 | C7150848-0 | J.M. | $4,880.00 | $18,240 | Yes | No | $0 |
| 25 | C8284598-0 | J.M. | $4,880.00 | $18,240 | Yes | No | $0 |
| 26 | C8332017-0 | J.S. | $4,880.00 | $18,240 | Yes | No | $0 |
| 27 | C7415302-0 | J.W | $17,440.00 | $18,240 | No | No | $0 |
| 28 | C7992914-0 | J.W. | $17,440.00 | $18,240 | No | No | $0 |
| 29 | C8297076-0 | K.M. | $4,880.00 | $18,240 | No | No | $0 |
| 30 | C6476905-0 | L.P. | $17,760.00 | $18,240 | Yes | Yes | $17,760.00 |
| 31 | C8282547-0 | L.P. | $14,000.00 | $18,240 | Yes | Yes | $14,000.00 |
| 32 | C7659810-0 | L.R. | $12,960.00 | $18,240 | Yes | Yes | $8,080.00 |
| 33 | C8260893-0 | M.R. | $0 | $18,240 | Yes | No | $0 |

| 34 | C8224009-0 | N.E. | $0 | $18,240 | Yes | No | $0 |
| 35 | C8242001-0 | R.E. | $4,880.00 | $18,240 | Yes | No | $0 |
| 36 | C8702242-0 | R.P. | $20,860.00 | $35,120 | Yes | Yes | $20,860.00 |
| 37 | C7861671-0 | S.H. | $16,800.00 | $18,240 | Yes | Yes | $16,800.00 |
| 38 | C6300109-0 | S.P. | $17,060.00 | $35,120 | Yes | Yes | $17,060.00 |
| 39 | C8383487-0 | S.P. | $320.00 | $18,240 | No | No | $0 |
| 40 | C7714455-0 | T. MASON | $5,366.00 | $18,988 | Yes | No | $0 |
| 41 | C8394655-0 | T. MASON | $0 | $18,240 | Yes | No | $0 |
| 42 | C7158981-0 | T.N. | $0 | $18,240 | Yes | Yes | $0 |
| 43 | C7893610-0 | T.R. | $13,720.00 | $18,240 | Yes | No | $0 |
| 44 | C7821396-0 | T.W. | $16,960.00 | $18,240 | Yes | Yes | $16,960.00 |
| 45 | C7930284-0 | T.W. | $13,720.00 | $18,240 | Yes | Yes | $13,720.00 |
| 46 | C8171186-0 | K.W. | $16,095.20 | $35,120 | No | No | $0 |
| 47 | C8544093-0 | N.P. | $9,900.00 | $35,120 | Yes | Yes | $9,900.00 |
| | | | $430,972.44 | $942,428 | 40 | 25 | $282,452.24 |

28. As indicated in the schedule above, MiDAS records and financial records obtained by agents show that the subject prisoner UIA/PUA claims account for the fraudulent outlay of approximately $430,972.44 in federally backed benefits. Absent detection from law enforcement, these fraudulent claims would have paid over $942,428.

29. During the investigation, agents obtained records from Charter-Spectrum and learned that IP.127 was active, held in the name of Terrell Mason, and statically assigned to the residence located at ADDRESS 1.

30. Agents recognized Mason's name as MiDAS records showed that the first claim filed in the scheme was in Mason's name. Bureau of Prison (BOP) records showed that Mason was an ex-convict discharged from federal prison on or about April 23, 2020, which was two days before a PUA claim was filed using his identity on April 25, 2020. Finally, MiDAS records showed that the claim requested wages from about

9

March 21, 2020 to at least April 23, 2020; a time-period during which Mason was incarcerated.

31. During the review of the subject prisoner claims, SOM-FIU also noticed several anomalies including that many of the claims were initially "fraud-stopped" by MiDAS. MiDAS' fraud algorithms identified the claims as problematic and flagged them for human review. Further investigation in MiDAS showed that most of the subject prisoner claims were accessed by a particular Unemployment Insurance Examiner (UIE) user: MooreD46 which was assigned to DANIELLE MOORE. Review of MooreD46's MiDAS activity showed that she accessed, viewed, or discarded fraud related holds on 40 of the 47 subject prisoner claims. In total, MooreD46's actions directly resulted in outlay of $282,452.24 of the $430,972.44 paid on the subject claims.

32. In addition to the 47 subject prisoner claims listed above, MOORE access and altered a UIA/PUA claim that was reviewed on IP.127 for claimant B.S. Although B.S. was not incarcerated, B.S. reported to SOM that the claim was fraudulently filed using her PII. The claim and disbursement information are as follows:

| MiDAS Claim No. | Date Filed | Claimant Name | Actual Loss | Potential Loss | Moore Accessed | Moore Altered | Payment After Moore |
|---|---|---|---|---|---|---|---|
| C7320614-0 | 5/4/2020 | B.S. | $12,480.00 | $18,240 | Y | Y | $7,600.00 |

33. SOM-FIU reviewed MooreD46's VPN records and determined between April 2020 and January 26, 2021, Comcast IP XX.XX.XXX.62 (IP.62) was used to log in MooreD46 over 400 times. Investigating agents obtained subscriber records from Comcast, which detailed that IP.62 was statically assigned to the residence located at ADDRESS 2 which was the known residence for MOORE and MOORE's then roommate.

*Search Warrants*

34.     In February 2021, agents applied for and obtained search warrants for
        Mason's then-residence located at ADDERSS 1and MOORE and
        MOORE's then-residence located at ADDRESS 2. Agents
        simultaneously executed those warrants on or about February 11,
        2021.

*ADDRESS 1*

35.     On or about February 11, 2021, agents found the following items of note at
        ADDRESS 1 (Mason's Residence):

- Dozens of credit/debit cards held in names other than Mason's name,
  including N.P.'s name, a subject prisoner claim that MOORE accessed
  and altered as listed above;

- Notebooks containing names, DOBs, SSNs, and other PII associated with
  unemployment claims;
- Multiple fake SOM Driver's Licenses bearing Mason's photo but other
  names;

- Bank statements in the names of the claimants, but bearing Mason's
  address;

- MGM betting slips & Moneygram Money Order receipts; and

- Magnetic card readers used in the reading and encrypting of credit/debit
  cards.

*ADDRESS 2*

36.     On or about February 11, 2021, agents found the following items of note at
        ADDRESS 2 (MOORE's residence):

- Various bank documents, handwritten notes, and notebooks containing
  PII including names, DOBs, SSNs, claim numbers for many
  individuals, some bearing the information of claimants that MOORE
  accessed and/or altered;

11

- Identity documents, both photocopies and physical items, of driver's licenses, Social Security cards, passports, and loadable SOM Talent debit cards for multiple individuals as discussed below; and

- MOORE's cell phone, an Apple iPhone 11, IMEI 352898119590645, telephone number XXX-XXX-6513, which contained numerous text messages and photographs bearing claimant information and PII, some of which MOORE accessed and/or altered (MOORE's cell phone).

37. Multiple names and PII were found in both the search warrant collected items from MOORE's residence and in text messages on MOORE's cell phone. In a recovered notebook, there was also handwritten notes with MOORE's MiDas login information stating a username of "MooreD46."

38. In other similar notebooks, there were handwritten notes listing the names and PII for the above referenced subject prisoner claims listed above. One specific piece of paper collected, as shown below, contained the subject prisoner names along with "Terrell Mason (Me)" and the SSN for Mason. The handwriting appears to be different than much of the handwriting contained within the notebooks.



39.     During this search of MOORE's residence, a document from MetroPCS bearing the customer name "daniell" contained a PIN number for a phone. Agents used that PIN number and gained access to MOORE's cell phone with telephone XXX-XXX-6513 that was recovered during this search.

40.     In total, items containing over 300 claim numbers and/or PII were found in ADDRESS 2, MOORE's residence. Some of that information matched claim numbers and/or PII found in the text messages from MOORE's cell phone. Additionally, some of the claim numbers and/or PII from the recovered evidence were for claims that MOORE accessed and altered.

### Interview of DANIELLE MOORE

41.     On or about February 11, 2021, MOORE consented to a voluntary interview with agents during the search and told agents that she was employed by the State of Michigan-Michigan Works Agency (MWA) for almost a decade. In or about Spring of 2020, MOORE and other MWA employees were temporarily assigned to be Claims Examiners at the Michigan Unemployment Agency (MUIA). MOORE reported that she received training on the MUIA system called MiDAS and MUIA gave her access to the system through her MWA assigned Dell Laptop. To access, MiDAS, MOORE used a VPN login and her unique username "moored46" and password. MOORE further reported that she did not let others log into MiDAS on her behalf. MOORE maintained control and custody of her Dell Laptop, which she accessed MUIA primarily via the internet located at her residence, ADDRESS 2.

42.     MOORE further reported to agents that she knew Mason through a family member, and she had approved dozens of PUA claims that Mason brought to her based-on Mason vouching for the legitimacy of claimants. MOORE stated that she should have properly vetted each claim by speaking to the claimant, but did not do so, which she acknowledged was inappropriate. MOORE denied ever receiving any cash from Mason. MOORE also stated that she had no idea that many of the claimants were prisoners and, if she had known, she never would have approved those claims.

43.     Additionally, MOORE admitted that she filed PUA claims in the names of others from her residence but usually they were for family or close friends who MOORE believed were entitled to benefits. MOORE further told agents that she never received cash from anyone-for "pushing" a UIA/PUA claim though to payment. MOORE acknowledged using her inside access to jump

13

friends and family members to the front of the line, but claimed this was an acceptable practice.

44.     MOORE reported she never paid MOORE's then roommate for PII or for anything related to the prisoner UIA/PUA clams. MOORE was also shown lined notebook sheets containing handwritten names and PII. MOORE confirmed that it was her handwriting but stated that the claims were part of her official duties.

### Interview of Terrell Mason

45.     On or about June 17, 2021, agents interviewed Mason in the presence of his attorney in the Midland County Jail. Mason told agents that he met MOORE through a mutual friend and learned that she worked at SOM-UIA and could push through PUA claims in exchange for cash. Mason admitted to filing dozens of false claims using the stolen identity of prisoners and paid MOORE $500 per claim to approve them. Mason estimates that he paid MOORE $30,000-$40,000 cash over the course of the scheme. Most of the payments took place at MOORE's house in Detroit. Mason never told MOORE that the claims were in the names of prisoners, but MOORE never asked.

### Interviews of MOORE's Former Roommate

46.     MOORE's former roommate was interviewed multiple times during this investigation. Since the execution of the search warrant, MOORE and this roommate no longer live together, and their relationship did not end amicably.

47.     MOORE's former roommate stated that MOORE worked for SOM for about 16 years and that MOORE was "deputized" to work on UI claims during the COVID-19 pandemic. MOORE's former roommate did not initially know MOORE was committing fraud. MOORE's former roommate suspected MOORE was involved in UIA/PAU fraud because strangers were coming to ADDRESS 2 and paid MOORE for assistance "jumping the line" or "expediting" their UIA/PUA claims.

48.     MOORE's former roommate observed that MOORE had more cash since she started examining UIA/PUA claims as she would lavish MOORE's Roommate with gifts and trips. MOORE's former roommate received numerous payments for MOORE through MOORE's former roommate's Cash App account for the UIA/PUA services MOORE provided. MOORE's UI

14

contacts often paid MOORE's former roommate through Cash App in increments of $50.00. MOORE's former roommate subsequently forwarded that money to MOORE's bank account.

49.     During this timeframe, MOORE told MOORE's former roommate that she was helping people file fraudulent claims and that she knew some of the names provided to her were not willing participants. During the pandemic timeframe, MOORE requested MOORE's former roommate provide her with PII for claims. MOORE's former roommate provided PII for three individuals in exchange for MOORE paying him $1,000 per name. MOORE had notepads with PII written in them.

50.     On or about August 10, 2022, MOORE's former roommate provided agents with photographs and screen captures of MOORE relevant to the investigation. MOORE's former roommate stated that he took the photograph below of MOORE laying on the bed at ADDRESS 2. Also appearing on the bed are stacks of U.S. currency, which MOORE's former roommate asserted were the proceeds of MOORE's UIA/PUA fraud.



51.     MOORE's former roommate stated that MOORE often stored cash and other items of value that were purchased with her UIA/PUA fraud proceeds at MOORE's relative's residence, not at ADDRESS 2.

52.     MOORE's former roommate stated that he took the photograph below of MOORE in the bedroom of ADDRESS 2. Appearing on the bed is a cash counting machine. MOORE told MOORE's former roommate that MOORE

borrowed the cash-counting machine from Mason when they were working together pushing through UIA/PUA claims.



53.   MOORE's former roommate provided dozens of screen captures, one depicted below, of his Cash App account detailing payments that he reported receiving from people to compensate MOORE for pushing through their UIA/PUA claims. Some of the Cash App payments referenced MOORE or "unemployment." These Cash App screen captures from MOORE's former roommate's cell phone were also corroborated by Cash App records as discussed below.



54.     Once UI claimants made payments to MOORE's former roommate's Cash
        App, MOORE's former roommate transferred the money to their Michigan
        First Credit Union (MFCU) account or their Huntington Bank account and
        then transferred the money to MOORE's MFCU bank account. MOORE's
        former roommate accepted the UI individuals' payments on behalf of
        MOORE because MOORE did not have Cash App or Zelle set up at that time.
        After MOORE started taking money from UI claimants for assistance,
        MOORE's former roommate did help MOORE set up a Zelle account.

                              *Bank and Tax Records*

55.     In the fall of 2022, agents obtained financial records for MOORE's Michigan
        First Credit Union (MFCU) account ending #080 (MFCU #080) from January
        2020 through July 2021. During that time, agents found over $55,000 in
        questionable cash deposits. Specifically, Agents found over $14,000 in cash
        deposits from the Cash App account controlled by MOORE's former
        roommate.

56.     Agents obtained MOORE's income tax returns for 2020 and 2021. MOORE
        only reported income from "Oak Park Public Schools" and retirement income
        from "Michigan Public Schools." Agents found no instance where MOORE

                                      17

reported or classified the $55,000 in cash income detailed in the paragraph above.

<u>*MOORE'S Phone Analysis and Cash App Records*</u>

57.    Agents reviewed and analyzed MOORE's cell phone, XXX-XXX-6513, that was collected during the execution of the search warrant at ADDRESS 2 in February 2021. During the analysis, agents located PII and/or UIA/PUA claim numbers that were provided to MOORE via text messages for assistance for at least 188 individuals. Of those 188 individuals, SOM-FIU reported MOORE accessed 162 of the claims and altered 86 of those. After MOORE altered the 86 claims, that State of Michigan paid a total of approximately $1.2 million to the claimants. For those 86 claims that MOORE altered, MOORE discarded holds 140 times for various indicators, to include identification verification, fraud, and other protests that the SOM system flagged relating to those claims. SOM-FIU further reported that MOORE's alterations of these claims were not made in the normal course of her employment as she did not receive these tasks from her assigned queue. The table below details the claims associated with the PII/claim numbers that were provided to MOORE via text communications that Moore altered and accessed:

| MiDAS Claim No. | Date Filed | Actual Loss | Moore Accessed | Moore Altered | Payment After Moore |
|---|---|---|---|---|---|
| C8898401-0 | 6/22/2020 | $25,140.00 | Yes | Yes | $25,140.00 |
| C6002582-0 | 5/17/2020 | $18,560.00 | Yes | Yes | $12,920.00 |
| C7974938-0 | 4/30/2020 | $26,594.22 | Yes | Yes | $26,594.22 |
| C8395930-0 | 5/18/2020 | $5,640.00 | Yes | Yes | $0.00 |
| C6793423-0 | 4/1/2020 | $15,697.83 | Yes | Yes | $11,396.31 |
| C6575450-0 | 4/21/2020 | $6,549.30 | Yes | Yes | $6,549.30 |
| C8085525-0 | 5/11/2020 | $27,856.98 | Yes | Yes | $14,036.85 |
| C7412332-0 | 4/21/2020 | $7,173.00 | Yes | Yes | $7,173.00 |
| C6002577-0 | 5/17/2020 | $12,884.34 | Yes | Yes | $10,264.62 |
| C8930658-0 | 6/28/2020 | $3,080.00 | Yes | Yes | $3,080.00 |
| C8016747-0 | 5/18/2020 | $18,080.00 | Yes | Yes | $18,080.00 |
| C7551511-0 | 4/21/2020 | $14,492.00 | Yes | Yes | $14,130.00 |
| C8167787-0 | 5/12/2020 | $32,500.00 | Yes | Yes | $32,500.00 |
| C8615584-0 | 5/26/2020 | $16,362.48 | Yes | Yes | $16,362.48 |
| C7746832-0 | 5/16/2020 | $13,003.02 | Yes | Yes | $13,003.02 |
| C8346499-0 | 5/15/2020 | $10,200.00 | Yes | Yes | $0.00 |

| | | | | | |
|---|---|---|---|---|---|
| C9315889-0 | 9/2/2020 | $15,292.34 | Yes | Yes | $15,292.34 |
| C7920387-0 | 5/11/2020 | $14,943.03 | Yes | Yes | $14,943.03 |
| C6070279-0 | 3/25/2020 | $9,550.00 | Yes | Yes | $9,550.00 |
| C7633868-0 | 4/29/2020 | $14,502.37 | Yes | Yes | $11,843.93 |
| C5690382-0 | 3/22/2019 | $0.00 | Yes | Yes | $0.00 |
| C5544072-0 | 5/13/2019 | $11,812.00 | Yes | Yes | $4,572.00 |
| C8269553-0 | 5/17/2020 | $17,120.00 | Yes | Yes | $17,120.00 |
| C7880335-0 | 5/8/2020 | $20,410.90 | Yes | Yes | $20,410.90 |
| C9068695-0 | 7/2/2020 | $0.00 | Yes | Yes | $0.00 |
| C6378731-0 | 3/31/2020 | $4,210.00 | Yes | Yes | $2,886.00 |
| C9005071-0 | 6/23/2020 | $15,778.00 | Yes | Yes | $7,683.20 |
| C6975017-0 | 4/2/2020 | $7,810.82 | Yes | Yes | $2,132.80 |
| C7957331-0 | 5/4/2020 | $26,857.67 | Yes | Yes | $21,217.67 |
| C9167539-0 | 9/7/2020 | $2,173.92 | Yes | Yes | $2,173.92 |
| C7804250-0 | 4/27/2020 | $16,329.35 | Yes | Yes | $11,609.35 |
| C7406051-0 | 4/15/2020 | $26,348.00 | Yes | Yes | $7,344.00 |
| C7412186-0 | 4/17/2020 | $4,599.68 | Yes | Yes | $4,599.68 |
| C6194290-0 | 6/16/2020 | $17,911.32 | Yes | Yes | $5,450.00 |
| C8513071-0 | 6/1/2020 | $17,593.05 | Yes | Yes | $17,593.05 |
| C7653190-0 | 4/22/2020 | $8,522.00 | Yes | Yes | $8,522.00 |
| C8299949-0 | 5/1/2020 | $12,356.92 | Yes | Yes | $12,356.92 |
| C5739001-0 | 6/17/2019 | $34,136.73 | Yes | Yes | $29,128.93 |
| C8186090-0 | 4/22/2020 | $33,073.46 | Yes | Yes | $33,073.46 |
| C7558717-0 | 4/29/2020 | $805.00 | Yes | Yes | $805.00 |
| C8627562-0 | 5/23/2020 | $5,800.00 | Yes | Yes | $5,800.00 |
| C5859208-0 | 5/6/2020 | $26,080.00 | Yes | Yes | $20,280.00 |
| C7474667-0 | 4/21/2020 | $33,965.00 | Yes | Yes | $33,965.00 |
| C9015088-0 | 6/27/2020 | $20,540.00 | Yes | Yes | $20,540.00 |
| C6983184-0 | 4/2/2020 | $30,734.29 | Yes | Yes | $30,734.29 |
| C7790193-0 | 4/28/2020 | $28,360.00 | Yes | Yes | $28,360.00 |
| C8052035-0 | 5/12/2020 | $34,486.00 | Yes | Yes | $24,504.00 |
| C7511972-0 | 4/22/2020 | $0.00 | Yes | Yes | $0.00 |
| C8859616-0 | 7/14/2020 | $13,670.74 | Yes | Yes | $13,670.74 |
| C7281489-0 | 5/3/2020 | $4,140.70 | Yes | Yes | $4,140.70 |
| C8800048-0 | 6/3/2020 | $10,360.00 | Yes | Yes | $10,360.00 |
| C7819837-0 | 4/27/2020 | $5,772.00 | Yes | Yes | $5,772.00 |
| C5636518-0 | 7/31/2019 | $8,482.27 | Yes | Yes | $7,297.11 |
| C8350669-0 | 5/18/2020 | $16,674.72 | Yes | Yes | $16,674.72 |

| | | | | | |
|---|---|---|---|---|---|
| C7387884-0 | 4/27/2020 | $26,840.90 | Yes | Yes | $26,840.90 |
| C6321581-0 | 4/21/2020 | $9,715.44 | Yes | Yes | $9,715.44 |
| C7690604-0 | 5/5/2020 | $37,251.80 | Yes | Yes | $37,251.80 |
| C8876472-0 | 6/28/2020 | $0.00 | Yes | Yes | $0.00 |
| C7867169-0 | 4/29/2020 | $16,960.00 | Yes | Yes | $12,680.00 |
| C7615266-0 | 4/21/2020 | $13,170.00 | Yes | Yes | $13,170.00 |
| C8840745-0 | 7/21/2020 | $11,928.00 | Yes | Yes | $10,056.00 |
| C6540350-0 | 3/25/2020 | $6,134.00 | Yes | Yes | $2,886.00 |
| C7774013-0 | 4/22/2020 | $10,520.00 | Yes | Yes | $10,200.00 |
| C7152341-0 | 4/9/2020 | $32,254.00 | Yes | Yes | $32,254.00 |
| C8602396-0 | 5/22/2020 | $4,600.00 | Yes | Yes | $4,600.00 |
| C7062144-0 | 4/6/2020 | $31,989.22 | Yes | Yes | $31,989.22 |
| C7366315-0 | 4/21/2020 | $35,280.00 | Yes | Yes | $35,280.00 |
| C8216254-0 | 5/11/2020 | $33,440.00 | Yes | Yes | $26,120.00 |
| C8578513-0 | 5/26/2020 | $20,540.00 | Yes | Yes | $20,540.00 |
| C6478363-0 | 4/21/2020 | $34,820.00 | Yes | Yes | $29,020.00 |
| C7953762-0 | 5/8/2020 | $27,748.70 | Yes | Yes | $27,748.70 |
| C8160851-0 | 5/13/2020 | $14,905.28 | Yes | Yes | $10,025.28 |
| C6711327-0 | 3/31/2020 | $42,237.20 | Yes | Yes | $37,079.00 |
| C5632483-0 | 7/9/2019 | $7,376.50 | Yes | Yes | $1,874.00 |
| C8417169-0 | 5/22/2020 | $14,804.37 | Yes | Yes | $14,804.37 |
| C7813498-0 | 4/29/2020 | $29,447.60 | Yes | Yes | $24,567.60 |
| C8319819-0 | 5/21/2020 | $25,526.34 | Yes | Yes | $25,526.34 |
| C6754375-0 | 3/31/2020 | $12,334.51 | Yes | Yes | $12,334.51 |
| C8540441-0 | 7/13/2020 | $0.00 | Yes | Yes | $0.00 |
| C5741623-0 | 9/30/2019 | $0.00 | Yes | Yes | $0.00 |
| C6284041-0 | 4/8/2020 | $4,810.00 | Yes | Yes | $2,886.00 |
| C7423708-0 | 4/21/2020 | $18,400.00 | Yes | Yes | $2,240.00 |
| C6765759-0 | 4/1/2020 | $17,538.00 | Yes | Yes | $17,538.00 |
| C8280736-0 | 5/16/2020 | $11,534.72 | Yes | Yes | $7,605.14 |
| C8170878-0 | 4/29/2020 | $13,560.00 | Yes | Yes | $13,560.00 |
| C8043021-0 | 5/15/2020 | $22,976.00 | Yes | Yes | $22,976.00 |
| | | **$1,413,658.03** | | | **$1,217,004.84** |

58.   Additionally, Cash App records, as explained below, were analyzed to corroborate the payment and scheme agreement from many of the text messages.

*Cash App and Communications Between DANIELLE MOORE and "R"*

59.   During the scheme, MOORE communicated with numerous individuals regarding UIA/PUA claims assistance via text message on cellular telephone number XXX-XXX-6513 (MOORE's cell phone). Specifically, in one ongoing conversation with "R" on cellular telephone number XXX-XXX-5170, MOORE and "R" agreed to work together to collect and split money from claimants who need UIA/PUA assistance. The following is a partial excerpt from the text communication on April 27, 2020:

| | |
|---|---|
| R: | You wanna make some money |
| Moore: | Doing what? |
| R: | Charging people to do their unemployment I'm so serious |
| Moore: | Cool |
| R: | You got to get cash app and how much would you charge |
| Moore: | $20 |
| R: | Hell naw at least $100 |
| Moore: | I ain't greedy |
| R: | That's not being greedy at all can you talk |
| Moore: | Give me a few minutes |
| R: | I got you a customer |
| R: | What's his cash app |
| Moore: | [MOORE's former roommate's Cash App account name] |

60.   Cash App records confirmed MOORE's former roommate's Cash App username. A review of MOORE's former roommate's Cash App records shows that from April 27, 2020 to May 1, 2020, "R" sent ten Cash App transfers to MOORE's former roommate's Cash App, totaling $645.00.

61.   Those payments were corroborated on "R's" Cash App records as well. Additionally, "R's" Cash App records show payments to "R" from UIA/PUA claimants names that match names and PII from text messages between "R" and MOORE. Some of the subject lines for the payments to "R" state "unemployment."

62.   In text messages on May 4, 2020, MOORE informed "R" to use a new Cash App account to make payments per their agreement. The following is a partial excerpt from the text communication on May 4, 2020:

| Moore: | I got a different cash app, so don't use [Name of MOORE's former roommate]'s anymore |
| Moore: | I'll call you when I leave this meeting |
| R: | Ok I got 3 for you too |
| R: | Shit maybe 4 [emoji] shit I need your computer |
| Moore: | [MOORE's family member's Cash App account name] |
| Moore: | Use that cash app |

63.   A review of MOORE's family member and "R's" Cash App accounts show from the above May 4, 2020 text conversation through June 24, 2020, "R" sent MOORE's family member's Cash App account 29 Cash App transfers totaling $1,920.00. Some of the subject lines are blank or reference "from the homies." At least one payment referenced food and one referenced a tattoo. Although not every subject line referenced MOORE or her UIA/PUA services, the monetary increments are consistent with the agreement between "R" and MOORE.

64.   A review of MOORE's former roommate's Cash App shows that on May 15, 2023, MOORE's family member's Cash App transferred $497.00 to MOORE's former roommate's Cash App with the subject line of "Dani." Agents believe that "Dani" is referencing MOORE. Also, the records show that on June 3, 2023, MOORE's family member's Cash App transferred $900.00 to MOORE's former roommate's Cash App again with the subject line of "Dani." The total transferred from MOORE's family member's Cash App to MOORE's former roommate's Cash App is $1,397.00.

65.   The same pattern of text messages between "R" and MOORE continue, where "R" brings MOORE "customers" and "R" calls MOORE "boss" or "co worker." Cash App records further corroborate their scheme.

### *Other Text Communications and Cash App Payments*

66.   Similarly, on April 28, 2020, MOORE, via email address dan5291983@XXXX.com, had text communications with "K" on telephone number XXX-XXX-6083 about UIA/PUA assistance for J.R. The following is a partial excerpt from the text communication on April 28, 2020:

| K: | Dani Mo… you have a minute to check my sis in-law's account or whenever you get a chance? |

K:        I'll give you her info whenever you ready

K:        She made an account… just wanna make sure she did it right. Her info:

           J.R.
           DOB: X/XX/1979
           Employer: XXX

Moore:  Ok

K:        I gotta blessing for you too

Moore:  Did she file or just make an account?

K:        She said she filed but her account wouldn't let her finish… mind you this is Ann's bro's wife & she got a touch of Cuz in her!

Moore:  Since she didn't finish, I can't pull it up

Moore:  I can call her tomorrow and file it over the phone with her

K:        Okay

K:        I'll text you her number

Moore:  Ok

K:        J.R. (XXX) XXX-4403

Moore:  Ok

67.    On April 30, 2020, MOORE's former roommate's Cash App received $20.00 from a user with a name matching J.R. with a subject line "for Dani." SOM-FIU confirmed that J.R.'s claim was filed on April 29, 2020. SOM-FIU further confirmed that MOORE accessed and altered J.R.'s claim, resulting in SOM paying J.R. money.

68.    On April 24, 2020, MOORE had text communications with "Cap" on telephone number XXX-XXX-0726 about UIA/PUA assistance. The following is a partial excerpt from the text communication on April 24, 2020:

Cap:      [L.H.]

Moore:  Ok

Cap:      Thank you

Moore:  Yeah ok

Cap:      I'll buy you a lottery ticket

Moore:  N**** just one

Moore:  Lord.

Cap:      The mega millions tho

Moore:  [MOORE's former roommate's Cash App account name]

Cap:     [MOORE's former roommate]?
Cap:     Done [with an attachment]
Moore:  Thank you

69.    On April 24, 2020, MOORE's former roommate's Cash App received a $20.00 transfer from a user with a first name matching L.H. with the subject line stating "Danielle services." SOM-FIU reviewed L.H's claim and found that L.H.'s claim was filed on April 27, 2020. MOORE accessed and altered that claim resulting in SOM paying L.H. money.

70.    On May 5, 2020, "Cap" had further text communications with MOORE asking for help with his brother's claim. The following is a partial excerpt from the text communication on May 5, 2020:

Cap:     Hey for another 20 can you do my brother
Cap:     Wait that sounded crazy
Cap:     Can you get him unemployment lol he don't got a job tho so 40
Moore:  Lord
Moore:  We can try tomorrow
Cap:     Ok thanks

71.    Based on my training, experience, and information gathered throughout this investigation, I believe that "Cap" is acknowledging his prior $20.00 payment to MOORE and is offering to pay another $20.00 if MOORE can help his brother, who does not have a job, get UIA/PUA.

72.    Later in the text communications, "K" again references his people owing MOORE "blessings." Based on my training, experience, and information gathered throughout this investigation, I believe that "blessings" could be in reference for items of value, like monetary payments. For example, on May 4, 2020, "K" texted MOORE "[name redacted] got her bread today… she gonna get you a blessing."

*Physical Possession of SOM Talent Cards*

73.    During the execution of the search warrant at MOORE's residence at ADDRESS 2, Agents recovered approximately nine SOM Talent debit cards bearing the names of individuals other than MOORE and MOORE's former roommate. SOM-FIU analyzed the claims, which were filed between

24

approximately May 2020 and October 2020, for those individuals and determined that MOORE accessed all of them and altered six of the nine claims. Post MOORE's alteration on those six claims, the State of Michigan paid a total of approximately $49,360.00 to these claimants. The table below details the claims associated with the SOM Talent cards found in MOORE's residence:

| Claim No. | MiDAS Claim No. | Claimant Name | Actual Loss | Potential Loss | Moore Accessed | Moore Altered | Payment After Moore | Moore .62 IP Address MiWAM |
|---|---|---|---|---|---|---|---|---|
| 1 | C8433855-0 | L.A. | $18,400 | $18,400 | Yes | Yes | $18,400 | Yes |
| 2 | C9050625-0 | J.J. | $8,740 | $29,262 | Yes | Yes | $8,740 | Yes |
| 3 | C8934288-0 | K.O. | $3,080 | $18,240 | Yes | No | $0 | No |
| 4 | C8366830-0 | M.F. | $18,400 | $18,400 | Yes | Yes | $18,400 | Yes |
| 5 | C6955433-0 | L.K. | $0 | $13,080 | Yes | Yes | $0 | Yes |
| 6 | C8703470-0 | A.G. | $3,820 | $18,240 | Yes | Yes | $3,820 | No |
| 7 | C9163114-0 | K.M. | $0 | $18,240 | Yes | No | $0 | No |
| 8 | C8063738-0 | S.M. aka G.M. | $0 | $14,574 | Yes | No | $0 | Yes |
| 9 | C8556634-0 | G.S. | $5,640 | $18,240 | Yes | Yes | $0 | Yes |
| | | | $58,080 | $166,676 | | | $49,360 | |

74.   All the accounts for the above claims, with the exception of the account for K.O., had associated residential addresses other than MOORE's residence , ADDRESS 2. K.O.'s account was associated with MOORE's residence address and then changed to another address. Additionally, four of the nine claims had the residence address of 14313 Coyle, Detroit, MI associated with their account.

75.   SOM-FIU further determined that MOORE discarded holds for identification verification or fraud stops on at least five claims. MOORE discarded identification verification holds on at least three of the claims, yet there was no identification documentation in the accounts. Additionally, in at least three of the claims' accounts, SOM-FIU noted that MOORE did not document her actions or any contact with the claimants when making her alterations or discarding fraud stops.

*MOORE's .62 IP Address Filing Claims and Accessing Accounts*

76.   In addition to MOORE's scheme of fraudulently accessing and altering claims, these nine claims associated with the recovered physical cards, were analyzed to look at the IP addresses that accessed the accounts both internally as a SOM employee and externally as a MiWAM customer. MOORE's .62 IP address, which was assigned to MOORE's residence address and was used by her SOM user ID, was used to access six of the above nine claims through the external MiWAM customer side. The table above notes those claims.

77.   Furthermore, SOM-FIU determined that five of those six claims that were accessed externally through MiWAM by MOORE's .62 IP address, excluding the claim for G.S., were filed from MOORE's .62 IP, not just merely accessed. MOORE's .62 IP address was accessing these accounts both internally through her employment with SOM and externally as a customer through MiWAM to file fraudulent PUA/UIA claims.

*Wire Fraud*

78.   Agents have reviewed the financial accounts associated with the subject UIA/PUA claims and learned that SOM utilized BOA to facilitate payment of UIA/PUA claims through prepaid debit cards or direct deposit into a bank account identified by the claimant. Additional UIA/PUA benefits are then electronically loaded on the debit cards or electronically directly deposited into the bank accounts at intervals thereafter based on the claimant's selection.

79.   To make the UIA/PUA payments, SOM computers and servers communicate with BOA to detail data regarding the claim and the associated payment (i.e., payment amount, account name, mailing address, etc.). The investigation has shown that SOM send signals via wire from Michigan to BOA data centers located in the states of Virginia and Texas.

*Additional Information and Charges - Terrell Mason*

80.   Mason is a convicted felon who in 2011 was charged on a multi-count federal indictment with a series of crimes involving wire & mail fraud, forgery, access device fraud, and other crimes (2:11-cr-20425). Mason subsequently pleaded guilty to conspiracy to commit mail & wire fraud and received a 76-month

custodial sentence. During the investigation, Agents learned that Mason was released from Milan FCI/half-way house on April 23, 2020, after serving another 10 months for violating his probation. Agents also learned that Mason was actively on probation for 2:11-cr-20425 during the initial phases of this investigation.

81.    Mason has been subsequently charged and convicted of new crimes relating to this investigation. Mason was arrested for violating his probation with his involvement in MOORE's fraud scheme. Mason was sentenced to 25 months incarceration for that probation violation.

82.    On May 5, 2021, Mason was charged in this investigation via criminal complaint (2:21−mj−30211), which was later superseded (2:22−cr−20205), with aggravated identity theft and wire fraud in violation of 18 U.S.C § 1028A and 1343.

83.    On or about July 5, 2022, Mason pled guilty to both counts in the superseding information. On December 2, 2022, Mason was sentenced to 57 months incarceration, two years supervised release, and restitution in the amount of $423,435.

### *Additional Information and Charges - MOORE's Former Roommate*

84.    MOORE's former roommate is a convicted felon. On June 7, 2021, MOORE's former roommate was charged with being a felon in possession of a firearm in violation of 18, U.S.C 922(g)(l). The charges stem from firearms seized by agents during the execution of the search warrant at ADDRESS 2 in February 2021 in this investigation. At the time of this filing, MOORE's former roommate has not yet pled guilty.

### **Conclusion**

85.    Based on the forgoing, there is probable cause to believe that DANIELLE MOORE has committed federal crimes, including (18 U.S.C. § 666(a)(1)(B)), wire fraud (18 U.S.C. § 1343), aggravated identity theft (18 U.S.C. § 1028A), and conspiracy to commit wire fraud (18 U.S.C. §1349) in connection with a scheme to defraud the federally backed pandemic unemployment benefits by means of false and fraudulent pretenses and representations and through the utilization of stolen identities.

Respectfully submitted,

Jacqueline E. Marquardt
Special Agent
Federal Bureau of Investigation


Sworn to before me and signed in my
presence and/or by reliable electronic means.

Hon. David R. Grand
United States Magistrate Judge


Dated:   March 4, 2024

28